IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| JAMES McQUILKIN, | : | HON. JEROME B. SIMANDLE |
| Plaintiff, | : | Civil No. 11-652 (JBS/AMD) |
| v. | : | |
| DELAWARE RIVER PORT AUTHORITY, | : | **OPINION** |
| Defendant. | : | |

APPEARANCES:

Stephen G. Console, Esq.
Rahul Munshi, Esq.
CONSOLE LAW OFFICES LLC
1525 Locust Street, 9th Floor
Philadelphia, PA 19102
    Attorneys for Plaintiff

William F. Cook, Esq.
William M. Tambussi, Esq.
BROWN & CONNERY
360 Haddon Avenue
Westmont, NJ 08108
    Attorneys for Defendant

**SIMANDLE**, Chief Judge:

# I.  INTRODUCTION

Plaintiff James McQuilkin alleges that his employer,
Defendant Delaware River Port Authority ("DRPA"), retaliated
against him after he questioned whether he had been denied
tuition reimbursement for his law school education because of his
age. Plaintiff alleges that, after he successfully challenged the
DRPA tuition reimbursement decision, Defendant retaliated against

him by setting his salary as a grants specialist too low, denying him raises and failing to create the position of grants administrator for him, all in violation of the retaliation provision of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 623(d).

Defendant brings this motion for summary judgment [Docket Item 35], arguing that the claims are time-barred and, in the alternative, that Plaintiff fails to establish a prima facie case of retaliation. Defendant also argues that Plaintiff is not entitled to liquidated damages.

For the reasons explained below, Defendant is entitled to summary judgment to the extent Plaintiff's claims depend on the initial setting of his salary as a grants specialist or for failing to create the position of grants administrator which did not exist within the DRPA. These claims fail because they are untimely, because Plaintiff cannot establish these are materially adverse actions, or both. However, as further explained below, summary judgment is denied to the extent Plaintiff alleges Defendant denied him a raise as a grants specialist in retaliation for his allegation of age discrimination.

## II. Background[1]

---

[1] Many of the factual assertions in Plaintiff's Counter-Statement of Material Facts are without citations to the record. According to L. Civ. R. 56.1(a), all statements of facts must be accompanied by citations "to the affidavits and other documents submitted in support of the motion." See also Fed. R. Civ. P.

## A. Facts

### i. Plaintiff's employment & law school tuition reimbursement

Plaintiff James McQuilkin was hired by Defendant DRPA in 1987 as a toll collector and later worked as a toll accountant and purchasing specialist before being promoted to grants specialist in 2005. (Statement of Material Facts ("SMF") [Docket Item 35-2] ¶¶ 1-4.) Plaintiff retired in January 2010. (Id. ¶ 5.)

In 1997, at the age of 49, while Plaintiff was working for the DRPA, he began attending law school, first at Widener Law and then at Rutgers School of Law - Camden. (Id. ¶ 6.) When Plaintiff first enrolled, the DRPA offered its employees a tuition reimbursement program that provided for 100 percent reimbursement for tuition, books and registration fees. (Counter-statement of Material Facts ("CMF") [Docket Item 37] ¶ 10.) The reimbursement policy did not require employees to demonstrate that their course of study was related to their jobs. (Id. ¶ 11.) Plaintiff received reimbursement for his first semester. However, effective January 1, 1998, the DRPA adopted a new, more limited policy that required employees to demonstrate a connection between their

---

56(c) ("A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record . . . ; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute . . . ."). The Court will not consider factual assertions that are without citations to the record when determining whether a material fact is disputed. See Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials, but it may consider other materials in the record.").

course of study and their job, present or prospective. (Def. Ex.
D-7 [Docket Item 35-3] at 2, 4; Def. Ex. 12 at 1.) The change in
policy was not communicated to all employees until December 1998.
(Id. at 4 n.5.) Plaintiff's request for tuition reimbursement for
his second semester was denied in January 1998. (SMF ¶ 9.)

Plaintiff filed an internal grievance, which was denied in
February 1998. (CMF ¶ 16.) In a letter explaining the denial, the
treasurer and CFO of the DRPA stated that because "there are no
current or prospective job opportunities in the Finance Division
requiring a law degree, there was no basis for approving the
tuition reimbursement request" under the new policy. (Pl. Ex. E
[Docket Item 37-2] at 1.) Years later, in 2004, Plaintiff met
with Jeffrey Nash, vice chair of the DRPA board of commissioners,
and complained to him about what Plaintiff described as "the
arbitrary and capricious exclusion of benefits under the DRPA
tuition reimbursement program . . . ." (Def. Ex. 12 at 1.)
Plaintiff identified other employees who received reimbursements
and suggested that some factor other than cost motivated his
denial. (Id. at 1-2.) Plaintiff stated: "I don't profess to
understand the actual reason for my exclusion from our tuition
reimbursement policy, or even why I have not been able to advance
into a more responsible job classification since graduating from
Rutgers Law School in 2001." (Id. at 2.)

DRPA investigated Plaintiff's reimbursement denial. (SMF ¶

15.) On May 12, 2004, Plaintiff met with Toni Brown, the DRPA's director of office of business development and equal opportunity. (Id.; Def. Ex. D-6 at 1.) As Ms. Brown recounted in an e-mail to Michael Joyce, assistant general counsel for the DRPA, and John Matheussen, CEO of the DRPA, Plaintiff mentioned in the meeting that

> 1) he thought it [reimbursement denial] might form the basis of an 'age' discrimination claim, and 2) he thinks the 'arbitrary and capricious' manner in which Barbara Jones denied his request is 'systemic' of the way decisions are being made regarding 'certain policies' within her control through Human Resources.[2]

(Id.) Plaintiff later testified that he told Ms. Brown that he had gone to the Equal Employment Opportunity Commission ("EEOC") to fill out an intake questionnaire, although that fact was not stated in Brown's summary e-mail. (SMF ¶¶ 16-17.) Brown did mention that

> Jim believes his age may well have been the reason for the adverse decision; he will be 57 in November, and was about 51 when he first started the law school program. The other four employees were significantly younger than Jim when they started their respective programs (late 20s, early 30s, and late 30s.)

(Def. Ex. D-6 at 2.)

---

[2] Barbara Jones, DRPA's chief administrative officer, allegedly did not return phone calls to Plaintiff about his reimbursement denial. (Def. Ex. D-6 at 1.) She allegedly told other employees that "There will be no legal openings for him (Jim McQuilkin)." (Id.) Ms. Brown observed that "Barbara's prediction proved to be wrong. Since 1997 . . . the DRPA has hired 6 attorneys (3 of those 6 attorneys were hired after Jim graduated in 2001.)" (Id.)

Upon completion of the investigation, and on the recommendation of Ms. Brown, the DRPA reimbursed Plaintiff in full, paying more than $30,000. (Id. ¶¶ 21-22.) Plaintiff never filed an EEOC charge in 2004. (Id. ¶ 29.)

## ii. Plaintiff's promotion to grants specialist

Later in 2004, Plaintiff discussed the possibility of joining DRPA's government relations department[3] with the department's director, William ("Bill") Shanahan. (Id. ¶ 33.) The parties dispute the content of discussions between Plaintiff and Mr. Shanahan as well as how to characterize what promises were made to Plaintiff, if any, relating to his job title, job description, or salary. According to Plaintiff,

> Bill had asked me if I would be interested in coming into the Grants Department, but not as a specialist. Bill had actually showed me a document that he was going to submit to the Personnel Document requesting two positions. One as a security administrator, and the second, which he asked me if I would be interested in, was for the grants administrator. And both of those jobs were listed on his document as Grade 10's.

(McQuilkin Dep. [Def. Ex. D-1; Docket Item 35-3] at 154:20-155:6.) By "Grade 10," Plaintiff was referring to his salary level. At the time, Plaintiff was working as a purchasing specialist, at a salary of Grade 7. (SMF ¶ 34.)

Plaintiff did not join the department as a grants administrator, however; it is undisputed that such a position did

---

[3] The parties also refer to this department as the "Grants Department."

not exist at the time, and, to this day, does not exist at the DRPA. (Id. ¶¶ 65-66.) It is also undisputed by the parties that formal action by the DRPA board of commissioners would have been required to create the grants administrator position. (Id. ¶ 63; see also McQuilkin Dep. 258:15-22 (acknowledging that the position of grants administrator did not exist and could be created only by the board).) Additionally, the DRPA was in the midst of a reorganization, which affected staffing. (Def. Ex. D-10; SMF ¶ 44; McQuilkin Dep. at 220:11-221:1.) The reorganization resulted in Plaintiff transferring from the purchasing department to the Grants Department, not as a grants administrator, but as a grants specialist at a salary of Grade 8. (Id. ¶ 42.) The step up in salary grade resulted in a $5,000 raise for Plaintiff, an increase of 12 percent. (Id.)

Still, Plaintiff asserts that Mr. Shanahan told him, and he was "led to believe," that his new salary upon joining the department would be at Grade 10.[4] (CSF ¶ 35; McQuilkin Dep. at

---

[4] Plaintiff testified:

   A. I was led to believe that's what the position would be [Grade 10].
   Q. But you were never guaranteed a 10; is that correct?
   A. No guarantee, no.
   Q. Mr. Shanahan merely proposed that you'd be placed into the position of Grants Administrator at a 10; correct?
   A. Yes.
   Q. And ultimately it was decided that you would be placed into the position of Grants Specialist at a Grade 8; correct?

240:4-8.) However, Plaintiff does not cite any portion of the record to show that Shanahan told Plaintiff that his position of grants specialist was guaranteed at a salary of Grade 10. To the contrary, Shanahan testified that the most he could do was recommend to human resources where to set Plaintiff's salary and that he had no authority to set Plaintiff's salary. (Shanahan Dep. at 26:4-27:5.) Shanahan testified he did not recall the specifics of his recommendation, but he was "pretty sure" he requested that Plaintiff be placed at Grade 10. (Id. at 26:24-27:1.) Plaintiff testified that he understood that Shanahan did not have the final authority to set his salary and that Shanahan never offered a "guarantee" of a specific salary grade. (McQuilkin Dep. at 39:17-20, 240:4-11.) Moreover, the salaries for all "specialists" at the DRPA are set at Grade 7 or 8. (Def. Ex. D-13; e-mail from Ms. Brown stating that "At the Authority all 'specialist' positions are slotted at Grades 7 and 8.")

On December 20, 2004, Plaintiff received a memorandum from Kelly Forbes, director of human resource services, stating that the "reorganization has impacted you as outlined below[.]" (Def. Ex. D-10.) The document showed that the salary for his new job as grants specialist was Grade 8, or $53,000. (Id.) Plaintiff accepted the grants specialist position at Grade 8 by signing an

---

A. Yes.

(McQuilkin Dep. at 240:7-19.)

acceptance form. (SMF ¶ 50.) Plaintiff's Grade 8 salary was made
retroactive to October 20, 2004. (Def. Ex. D-11.) Until his
retirement in 2010, Plaintiff continued to receive annual merit
increases and received a special holiday check equal to 0.5
percent of his base salary. (SMF ¶¶ 54, 58.) Plaintiff was never
demoted, disciplined or terminated. (Id. ¶ 60.)

In December 2004, Mr. Shanahan asked Ms. Brown about
Plaintiff's salary being set at Grade 8, not 10. The difference
between a mid-point Grade 8 salary and a mid-point Grade 10
salary was approximately $11,200. (Pl. Ex. Y.) Ms. Brown e-mailed
Mr. Matheussen saying, "Bill called me to discuss this one, he
wondered why McQuilkin's new position was 'downgraded' from a 10
to an 8. I gave you a heads up on this one." (Pl. Ex. J.) Later,
Brown wrote to Matheussen, indicating that she would request that
two other employees have their salaries moved "back to 12 and 11,
respectively," adding, "I'd like to talk to . . . you again
regarding McQuilkin (this one is a real stretch, especially in
light of everything that has already been done)." (Pl. Ex. L.)
Matheussen responded, "I agree." (Id.) Matheussen clarified this
exchange during his deposition, explaining that "everything that
has already been done" referred to "[m]oving him [Plaintiff] from
the purchasing department into the grants department."
(Matheussen Dep. at 96:6-10.) Matheussen added:

> Remember, we moved him without posting the position. We
> felt as though he was qualified to do the job as grants

9

> specialist. We didn't post it for anyone else, and we
> made him a grants specialist and gave him the appropriate
> job assignment, job description, and job grade level. Now
> people were subsequently looking to see if he could be
> paid additional monies on top of that. The job
> description, the job grade level didn't support it.

(Id. at 97:2-11.)

### iii. Supervisors advocate for a raise for Plaintiff, new job title of grants administrator

Mr. Shanahan continued to advocate for the creation of the grants administrator position for Plaintiff. In July 2005, Mr. Nash indicated in an e-mail to Mr. Matheussen that he liked Shanahan's proposal. (Pl. Ex. M.) Mr. Matheussen was not convinced. In an e-mail to Ms. Brown, dated July 22, 2005, Matheussen stated, "I'm concerned about a whole host of issues, none the least of which are Jim's settlement/raise last year (please tell me $ amounts and dates on that), the fact that it is suggested we do it without posting, giving some raises/promotions while we are telling others of our budget problems and the impact it would have on Purchasing." (Pl. Ex. M [Docket Item 39] at 1.)

In February 2006, Mr. Shanahan drafted a proposal for personnel changes in his department, including the creation of a grants administrator position. (Pl. Ex. O. at 1.) Shanahan acknowledged that "[t]his position does not exist in the current structure," but went on to describe the administrator's duties and stated that, although Plaintiff was a grants specialist, "[h]e has been doing the job as Grants Administrator for the past

8 months." (Id.) He added: "Jim McQuilkin has been to doing [sic] this job admirably and should be recognized for his efforts by establishing the title and promoting him into the position. Jim is currently a Grade 8, and the position should be at least a Grade 10 or 11." (Id. at 2.) Ms. Brown testified that between December 2005 and May 2007, "the board was at an impasse and there were no meetings and very little to any [sic] business that was being completed." (Brown Dep. at 191:7-11.)

Both Mr. Shanahan and Linda Hayes, the capital grants manager, lobbied again for the creation of a grants administrator position in 2007. (SMF ¶ 65.) Ms. Hayes wrote to Mr. Matheussen to say, "Several months ago, I spoke to you about the need to upgrade Jim McQuilkin to the Grants Administrator position that he was promised when he took the job and that he regularly performs." (Pl. Ex. Q.) She added: "It seems inherently unfair to have someone doing a job on a high professional level, working closely with Legal and Engineering staffs, among others and getting paid at the grade 9 rate."[5] (Id.) The DRPA hired the Hay Group, a consulting firm, to study what the compensation for a grants administrator position should be, if the position were created. (Id. ¶ 66.) The Hay Group concluded that the "job has an evaluation that places it in grade 10 . . . ." (Def. Ex. D-15.)

_____

[5] The reference to Grade 9 appears to be a typographical error. There is no allegation in the record, or Plaintiff's papers, that Plaintiff ever received a salary of Grade 9.

The memo noted that "[w]hile the Grants Administrator position is essentially a new position, the current Grants Specialist incumbent has been performing the duties of this position for quite some time." (Id.)

In late 2007, Shanahan drafted a proposal to create the position for the board of commissioners. (Pl. Ex. Z; CSF ¶¶ 83-84.) The position was not created. Mr. Shanahan testified that on the day of the board meeting, Mr. Matheussen told Shanahan that "the board's pulling this now, you know, as of today." (Shanahan Dep. at 54:20-23.) Shanahan further testified he didn't know why the proposal was not presented to the board. (Id. at 53:16-18.) Shanahan reported back to Plaintiff that "Mr. Matheussen told him to withdraw it. It was on the agenda to be considered by the Board, and it was withdrawn." (McQuilkin Dep. at 263:20-23.)

In 2008, the DRPA retained the Hay Group again, this time to evaluate the salary of the grants specialist position. (Def. Ex. D-16.) The consultant concluded, in a memo dated December 2, 2008, that because "the Grants Specialist position has expanded and evolved over recent years to include the direct responsibility of working through the entire Grants process, dealing directly with federal and state entities, and seeing Grants projects through to completion while ensuring compliance on all aspects of the grants," the job "has an evaluation that places it in a Grade 10." (Id.) Ms. Brown testified that the DRPA

"accepted the recommendation" but the grants specialist salary was not increased. (Brown Dep. at 161:18-162:21.) Brown's understanding was that "at some point this was going to become a part of the operating budget and the salary was going to be increased. The grade, the position was going to be increased from a Grade 8 to a Grade 10." (Id. at 162:11-19.) When asked why the salary was not increased, Brown responded: "I don't know." (Id. at 162:22-23.) Brown also testified: "I believe that there is documentation, to the effect that there certainly, as part of the 2010 operating budget, an increase certainly was contemplated for the grants specialist position, which would have taken effect January 1, 2010, but . . . Mr. McQuilkin did submit his documentation that he intended to retire." (Id. at 194:3-11.)

In September 2009, Ms. Hayes corresponded with Mr. Matheussen again about promoting Plaintiff. (Pl. Ex. K.) She wrote:

> I strongly believe that Jim merits this promotion and have tried for over 2 years to ascertain why this has not happened. . . . Many other persons who I feel merit a raise much less, based on the complexity of this job, have received their promotions and I just can't understand why this happens . . . . Frankly it makes me think that there is some underlying reason for the lack of action on this, so I very much want to pursue this with HR.

(Id.) Plaintiff himself testified that "what's behind this whole issue" was the fact that he had received tuition reimbursements in the fall of 2004. (McQuilkin Dep. at 280:16-23.)

Mary-Rita D'Alessandro, Esq., assistant to the board chair, testified that she got the impression from Mr. Joyce that "there's a history here" and "we have made accommodations for Jim in the past and we're not going to make this one." (D'Alessandro Dep. at 21:19-22:11.) D'Alessandro testified that Mr. Joyce and and Mr. Matheussen felt they had "bent over backwards for this guy . . . ." (Id. at 27:12-15.) At the same time, D'Alessandro testified she did not have any specific recollection of Mr. Joyce or Ms. Brown saying anything that would suggest that Plaintiff's salary remaining at Grade 8 was related to his age. (Id. at 64:18-65:7.) She stated that she had no knowledge of Plaintiff's age affecting his salary status. (Id. at 70:14-19.) Neither Joyce nor Matheussen supported giving Plaintiff a raise, according to D'Alessandro. (Id. at 28:12-14.)

On October 23, 2009, Plaintiff filed a complaint with the EEOC alleging age discrimination and retaliation. (Compl. [Docket Item 1] Ex. 1.) Plaintiff retired in January 2010.

**B. Procedural history**

The EEOC issued Plaintiff a right-to-sue letter on November 15, 2010. (Compl. Ex. 2.) Plaintiff brought this suit.[6]

Defendants moved to dismiss the Complaint. [Docket Item 8]; see also McQuilkin v. Del. River Port Auth., No. 11-652, 2011 WL

---

[6] The Court exercises jurisdiction under 28 U.S.C. § 1331, because Plaintiff's claims arise under federal law.

5325620 (D.N.J. Nov. 3, 2011), ECF. No. 12. The Court dismissed Plaintiff's age discrimination claim under the ADEA, because "[t]here are no facts alleged which give rise to an inference that the Grants Specialist position was downgraded from level 11 to level 8 compensation due to the Plaintiff's age." Id. at *7. The Court denied Defendant's motion to dismiss the retaliation claim brought under the ADEA, because Plaintiff engaged in protected activity by filling out the EEOC questionnaire and opposing the Defendant's denial of tuition reimbursement to older employees, and the Complaint alleged that Defendant "downgraded the position to grade level 8 only after the Plaintiff was hired." McQuilkin, 2011 WL 5325620, at *5 (citing Compl. ¶ 26). The Court stated that the "complaint sufficiently alleges that the Plaintiff was paid less than the position was marketed as and this pay decrease was made after the Plaintiff was selected, as if aimed at him. This is sufficient to state a claim for an adverse employment action." Id. The Court found a plausible basis for inferring causation. Id. at *6.

Defendant filed the present motion for summary judgment, and the Court heard oral argument on September 23, 2013.

## III. Standard of review

A court shall grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ.

P. 56(a). A dispute is "genuine" if, based on the evidence in the record, a reasonable jury could return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is "material" if it might affect the outcome of the suit. Id. The court will view evidence in the light most favorable to the non-moving party and "all justifiable inferences are to be drawn in [that party's] favor." Hunt v. Cromartie, 526 U.S. 541, 552 (1999).

## IV. Discussion

The ADEA prohibits employers from retaliating against an employee who opposes discrimination on the basis of age or raises allegations of age discrimination. 29 U.S.C. § 623(d)[7]; see also Fogleman v. Mercy Hosp., Inc., 283 F.3d 561, 568 (3d Cir. 2002) (referencing the ADEA, among other statutes, and stating that it "forbids discrimination against an individual because 'such individual' has engaged in protected conduct"); Krouse v. Am. Sterilizer Co., 126 F.3d 494, 500 (3d Cir. 1997) (treating the

---

[7] The ADEA provides: "It shall be unlawful for an employer to discriminate against any of his employees . . . because such individual . . . has opposed any practice made unlawful by this section . . . ." 29 U.S.C. § 623(d). The statute makes it unlawful for an employer to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." § 623(a)(1). The law also prohibits an employer from "limit[ing], segregat[ing], or classify[ing] his employees in any way which would deprive or tend to deprive any individual of employment opportunities . . . because of such individual's age[.]" § 623(a)(2).

ADEA and the Americans with Disabilities Act as essentially
identical for purposes of retaliation precedents).

In New Jersey, a charge of discrimination or retaliation
must be filed with the EEOC within 300 days of the alleged
unlawful employment practice. Miller v. Beneficial Mgmt. Corp.,
977 F.2d 834, 842 (3d Cir. 1992); 29 U.S.C. § 626(d)(1)(B). These
filing deadlines "function as statutes of limitations" which
begin "at the time of the alleged discrimination." Parikh v.
United States, 491 F. App'x 303, 306 (3d Cir. 2012) (citing Del.
State Coll. v. Ricks, 449 U.S. 250, 256-58 (1980), and dismissing
an ADEA claim as time-barred). Because Plaintiff here did not
file an EEOC charge against the DRPA until October 23, 2009
(Compl. ¶ 12; Compl. Ex. 1), Plaintiff must allege a discrete act
of retaliation on or after December 27, 2008, to survive summary
judgment.

Defendant argues that Plaintiff's retaliation claim is time-
barred. (Def. Mot. Br. at 21.) Defendant acknowledges that "when
a discriminatory compensation decision or other practice is
adopted" by the employer, each resulting, discriminatory paycheck
constitutes an independent "unlawful practice" under the ADEA.
See 29 U.S.C. § 626(d)(3).[8] Consequently, Defendant characterizes

---

[8] This provision originated in the Lilly Ledbetter Fair Pay
Act of 2009 ("FPA"), codified in large part at 42 U.S.C. §
2000(e)-5(e)(3)(A). For purposes of the ADEA, the FPA states:

an unlawful practice occurs, with respect to compensation

Plaintiff's allegations instead as a "failure-to-promote claim." (Id. at 22.) Defendant cites Noel v. Boeing Co., 622 F.3d 266 (3d Cir. 2010) and Schuler v. PricewaterhouseCoopers, LLP, 595 F.3d 370 (D.C. Cir. 2010), to argue that failure-to-promote claims are not compensation discrimination claims within the meaning of the FPA, because they do "not involve a pay disparity," and therefore do not gain the benefit of the renewal of the 300-day window upon receiving each paycheck. (Def. Mot. Br. at 23, 26.)

In Schuler, the plaintiff Harold Schuler alleged that his employer denied him a promotion to partner in violation of the ADEA.[9] Schuler, 595 F.3d at 373. The plaintiff argued that the decision not to promote him was an "other practice," under 29 U.S.C. § 626(d)(1)(3), and was "'intertwined with a discriminatory compensation decision' because as a result of that decision he received significantly less remuneration than he

_____

in violation of this chapter, when a discriminatory compensation decision or other practice is adopted, when a person becomes subject to a discriminatory compensation decision or other practice, or when a person is affected by application of a discriminatory compensation decision or other practice, including each time wages, benefits, or other compensation is paid, resulting in whole or in part from such a decision or other practice.

29 U.S.C. § 626(d)(3).

[9] The plaintiff alleged he was denied promotions on three occasions. Schuler, 595 F.3d at 373. The portion of the Schuler opinion relevant to this case concerns the first two denials, which occurred more than 300 days prior to the plaintiff filing EEOC charges. Id. at 374.

18

would have as a partner. Id. at 374. The D.C. Circuit disagreed. The court stated that "in order to benefit from the [Fair Pay Act] Schuler must bring a claim involving 'discrimination in compensation' and point to a 'discriminatory compensation decision or other practice.'" Id. The court distinguished "paying different wages or providing different benefits to similarly situated employees" from "promoting one employee but not another to a more remunerative position." Id. Noting that the FPA was enacted to overrule the U.S. Supreme Court's decision in Ledbetter v. Goodyear Tire & Rubber Co., 550 U.S. 618 (2007), in which a plaintiff-employee claimed she was being paid significantly less than male colleagues, the D.C. Circuit stated that "the statute is directed at the specific type of discrimination involved in that case and not to other unspecified types of discrimination in employment." Id. at 375. The court held that the failure to promote an employee "to a higher paying position is not a 'compensation decision or other practice' within the meaning of that phrase in the [Fair Pay Act] and Schuler's failure-to-promote claim is not a claim of 'discrimination in compensation.' The [FPA] therefore does not revive his claims under the ADEA." Id.

In Noel, the plaintiff, a black Haitian national, alleged that his employer failed to promote him with an accompanying step up in salary grade in violation of Title VII of the 1964 Civil

19

Rights Act. Noel, 622 F.3d at 268, 270. The plaintiff did not file his EEOC charge within 300 days, but argued that the FPA "revives his claim since each paycheck he received during the requisite time period started the administrative clock ticking anew." Id. at 270. The Third Circuit first determined that the plaintiff had not pleaded a "discrimination-in-compensation claim" because his factual allegations were focused on the allegedly discriminatory failure to promote and he did not allege that white peers performing the same work received more pay. Id. at 272. The court then turned to "whether, under the FPA, a failure-to-promote claim constitutes 'discrimination in compensation.'" Id. Citing Schuler with approval, the Third Circuit held that it did not. Id. at 275. The court stated

> the FPA was enacted to address a particular type of employment discrimination, compensation decisions, which are often concealed and not discovered until long after the 180- or 300-day administrative period expires. There is no indication, however, that Congress intended the FPA to apply to discrete employment decisions, like promotion decisions, and Noel cites no authority for that proposition.

Id. at 274. The court further noted that "discrete employment acts trigger the administrative clock at the time the employment decisions occur." Id. at 275. The Third Circuit thus declined to treat a failure-to-promote claim as an "other practice" under Title VII. Id. To fit within the scope of the FPA, a "discriminatory 'other practice,' while not actually setting a disparate remuneration level, must relate to pay disparity." Id.

at 273 n.6.

Here, Plaintiff disputes Defendant's characterization of his claim. (Pl. Opp'n at 30.) Plaintiff contends that his claim is a "retaliatory <u>compensation</u> <u>claim</u> where Defendant wrongfully denied Plaintiff: (a) the salary he was promised from the outset by his supervisor; (b) salary raises that were advocated for by his supervisors and the Hay Group; and (c) a new job title and pay commensurate with his job duties." (<u>Id.</u>) Plaintiff suggests his "case is and always has been about being continually denied pay matching his responsibilities in retaliation for engaging in protected activities. Accordingly, <u>Noel</u> is not dispositive of this matter." (<u>Id.</u>) Instead, Plaintiff argues his case is controlled by <u>Mikula v. Allegheny Cnty.</u>, 583 F.3d 181 (3d Cir. 2009). (<u>Id.</u> at 28-29.)

In <u>Mikula</u>, the female plaintiff requested a salary increase and a change in job title to her human resources department, because she alleged she was making more than $7,000 less than male co-workers, but never received a response from HR. <u>Mikula</u>, 583 F.3d at 182. The Third Circuit, on rehearing, held that "failure to answer a request for a raise qualifies as a compensation decision because the result is the same as if the request had been explicitly denied." <u>Id.</u> at 186. The holding in <u>Mikula</u> was distinguished by the Third Circuit in <u>Noel</u>, which noted that a claim for failure to receive a raise was different

21

from failing to receive a promotion, which is a discrete employment act.[10] <u>Noel</u>, 622 F.3d at 275.

Here, Plaintiff argues that, like the plaintiff in <u>Mikula</u>, he "did not asked [sic] to be 'promoted' to a new position with new responsibilities, and never sought to move up the DRPA organization chart. Rather, he requested higher pay as he would continue to perform the <u>same</u> job duties and report to Ms. Hayes and Mr. Shanahan, his <u>same</u> supervisors." (Pl. Opp'n at 29.)

In reply, Defendant argues that "this is <u>not</u> a 'compensation discrimination' case as that term is understood in <u>Noel</u>." (Reply at 12.) Defendant argues that in <u>Noel</u>, "the Third Circuit specifically held that <u>Mikula</u> does <u>not</u> apply" to failure-to-promote claims. (<u>Id.</u>)

Defendant is too quick to dismiss Plaintiff's complaint as alleging only a failure to promote. Plaintiff asserts three distinct decisions which he believes are actionable under the ADEA retaliation provision: the initial setting of Plaintiff's salary, the failure to create the grants administrator position, and the failure to give him a raise as a grants specialist. (<u>See</u>

_____

[10] In describing <u>Mikula</u> in <u>Noel</u>, the Third Circuit mentioned only that "the plaintiff sued the Allegheny County Police Department for gender discrimination based on its failure to give her a pay raise." <u>Noel</u>, 622 F.3d at 275. The Third Circuit made no mention of the fact that the <u>Mikula</u> plaintiff requested a change in job title. Clearly, the salient fact in <u>Mikula</u> was that the plaintiff requested raises and never received a response. <u>Id.</u>; <u>Mikula</u>, 583 F.3d at 186 (holding that "failure to answer a request for a raise qualifies as a compensation decision").

Compl. ¶¶ 29, 33, 36, 37 (alleging that the setting of Plaintiff's salary at Grade 8 was discriminatory and retaliatory and asserting that the consultant recommended changing the salary for the grants specialist position); Pl. Opp'n at 11 ("Defendant's failure to give Plaintiff salary raises from 2005 to 2010 that were urged by his supervisors and recommended by an outside consulting agency").) The Court will consider each action in turn.

## A. Setting Plaintiff's initial salary at Grade 8

### i. Timeliness

Plaintiff asserts that he discussed with Mr. Shanahan taking a position within the Grants Department at a salary of Grade 10, but he ultimately was offered a grants specialist position at Grade 8. Despite having an expectation that his salary would be two grades higher, Plaintiff signed an acceptance form for his grants specialist position acknowledging his salary would be set at Grade 8. (McQuilkin Dep. at 242:23-243:13.)

Plaintiff cannot invoke the tolling provisions of the FPA for a discrete employment act that occurred in 2004, when he knew at the time of his promotion that there was a pay disparity between what he believed he was due and what he was offered. As the Third Circuit has held, "discrete employment acts trigger the administrative clock at the time the employment decisions occur." Noel, 622 F.3d at 275. Although Plaintiff has testified that, at

the time, he did not make any connection between his salary grade and his allegations of age discrimination, Plaintiff was aware at the time that his salary was set below the level he expected, and within a matter of weeks, Mr. Shanahan was inquiring about the Grade 8 salary. This is not a case where Plaintiff accepted his new salary and discovered only years later that he had been receiving a lower salary than he should have been getting. Plaintiff knew instantly that the salary was two grades below where he thought the salary should be.

The ADEA provides Plaintiff 300 days to file a complaint with the EEOC with any suspicions that a compensation decision was discriminatory. Instead of going to the EEOC, Plaintiff opted to work with his supervisors to see if his salary could be increased. That may have been a sensible decision at the time, but it is not one that entitles Plaintiff to invoke the FPA tolling provisions now. For a discrete employment action, such as an increase in salary that the Plaintiff knew at the time was below what (he claims) it should have been, FPA tolling does not apply. Therefore, to the extent Plaintiff's claim alleges that his initial salary at Grade 8 was retaliatory, that claim is time-barred.

### ii. ADEA reliation

Even if the Court were to find this claim timely, Defendant would still be entitled to summary judgment. There is no basis in

the record for a retaliation claim arising out of Plaintiff's promotion to grants specialist with a starting salary of Grade 8. Plaintiff asserts that Mr. Shanahan "<u>told</u> Plaintiff that his new position would be at Grade Level 10 or Grade Level 11." (CSF ¶ 35.) In support, Plaintiff cites the following passage of his deposition testimony:

> Bill had asked me if I would be interested in coming into the Grants Department, but not as a specialist. Bill had actually showed me a document that he was going to submit to the Personnel Department requesting two positions. One as a security administrator, and the second, which he asked me if I would be interested in, was for the grants administrator. And both of those jobs were listed on his document as Grade 10's.

(McQuilkin Dep. at 154:21-155:6; CSF ¶ 35.) Far from supporting the claim that the grants specialist position came with a Grade 10 salary, this testimony only supports the conclusion that a grants administrator position might have had a salary of Grade 10. Plaintiff did not produce any document referenced in his testimony or in his Complaint that linked Grade 10 to the grants specialist position. He testified that he had an expectation of a higher salary based on talks with Shanahan, but the cited testimony provides no basis for that impression.

The only cited evidence that speaks to a re-classification of the specialist salary grade is an ambiguous reference in an e-mail from Ms. Brown to Mr. Matheussen, in which she summarizes an inquiry she received from Mr. Shanahan. (Pl. Ex. J.) She wrote: "[Shanahan] wondered why McQuilkin's new position was

'downgraded' from a 10 to an 8." (Id.) But Ms. Brown appears only to be parroting what Shanahan had asked, and Shanahan never testified that the grants specialist salary was ever set at, marketed as, or offered to anyone at Grade 10. Shanahan merely recommended that compensation to relevant authorities. (Shanahan Dep. at 26:4-27:5.) According to Brown, all specialist positions at the DRPA are set at Grade 7 or 8. (Def. Ex. D-13.) Brown did correspond with Matheussen about two other employees and "taking their grades back to 12 and 11, respectively," but did not mention taking Plaintiff's "grade back." (Pl. Ex. L.) When Shanahan advocated for Plaintiff's further promotion in February 2006, he stated that Plaintiff had been performing duties equivalent to those of a grants administrator "for the past 8 months" -- a time frame that does not extend back to the moment Plaintiff was promoted to grants specialist. Even assuming that the work of a grants administrator should be compensated at a Grade 10, the evidence does not show that Plaintiff was doing that work when he signed on as a grants specialist. There is no basis for finding that Plaintiff was entitled to a Grade 10 salary at the time he was promoted to grants specialist.

One reference in Ms. Brown's e-mail to the word "downgraded" -- quoting Mr. Shanahan -- is not enough evidence to support an inference that Plaintiff was promised a Grade 10 salary for the position of grants specialist, when Shanahan himself testified he

made no such guarantee.[11] There is no other evidence of a

"downgrade," and the testimony of both Shanahan and Plaintiff

lays to rest any doubt whether the position of grants specialist

had ever been set at Grade 10. "'[W]here the record taken as a

whole could not lead a rational trier of fact to find for the

non-moving party, there is no genuine issue for trial.'" <u>NAACP v.

N. Hudson Reg'l Fire & Rescue</u>, 665 F.3d 464, 475 (3d Cir. 2011),

<u>cert.</u> <u>denied</u>, 132 S. Ct. 2749 (2012). Drawing all reasonable

inferences in favor of Plaintiff, the Court holds that the record

cannot support the finding that Defendant's salary was set at

Grade 10 and lowered to Grade 8, or that any alleged downgrade

was in retaliation for Plaintiff's protected activity. Defendant

is entitled to summary judgment on this portion of the claim.

## B. Failure to create the grants administrator position

### i. Timeliness

To the extent Plaintiff's claim depends on Defendant's

failure to create the job title of grants administrator and

promote him to that position, the claim is time-barred by the

FPA. A failure-to-promote claim, based on a discrete employment

action of which Plaintiff had knowledge at the time it occurred,

---

[11] Moreover, Plaintiff does not produce evidence showing
that retaliation for his protected activity was a determinative
factor in his promotion. <u>LeBoon v. Lancaster Jewish Cmty. Ctr.
Ass'n</u>, 503 F.3d 217, 232 n.8 (3d Cir. 2007), <u>cert.</u> <u>denied</u>, 128 S.
Ct. 2053 (2008). (<u>See</u> <u>also</u> Reply at 4-6 (arguing there is no
causation between Plaintiff's comment and his promotion).)

is not eligible for FPA tolling.

Plaintiff avoids characterizing his request as one for a promotion, but his supervisors described the request as such. (See Pl. Ex. O at 1 ("McQuilkin . . . should be recognized for his efforts by establishing the title and _promoting_ him into the position) (emphasis added); Pl. Ex. Q ("I spoke to you about the need to _upgrade_ Jim McQuilkin") (emphasis added); Pl. Ex. K ("I strongly believe that Jim merits this _promotion_") (emphasis added).) Although Plaintiff argues that he merely requested that his pay and title be recalibrated to reflect his duties, such a request is still properly considered a promotion. Plaintiff was not requesting a job title or compensation package that would have represented a horizontal move; he was requesting a step up in title and pay -- the hallmarks of a promotion.

His argument that he was already performing those duties is unavailing. While he may have been performing duties beyond his stated job description, he was not performing a job that otherwise existed within the DRPA organization and Defendant merely refused to label his work appropriately. Other companies in the industry might have hired professionals as "grants administrators," but Plaintiff was not performing the job of a "grants administrator" _for_ _the_ _DRPA_ because the organization did not have, and never has had, such a post. Plaintiff is not entitled to the benefits of the FPA simply because Defendant may

have a different organizational structure with different compensation schemes than other comparable employers. In effect, Plaintiff is arguing that he was undercompensated for the work he was doing, that he had more responsibility than his job title indicated, and he wanted a promotion in title and salary to reflect that work. The majority of American professionals might feel the same way.

Moreover, Mr. Matheussen's alleged "blocking" of the grants administrator was a discrete employment act of which Plaintiff had knowledge at the time it occurred. Plaintiff testified that Mr. Shanahan told him that Matheussen wanted to withdraw the grants administrator proposal from the board's agenda. By late 2007, Plaintiff and his supervisors had already spent nearly two years fighting to increase Plaintiff's salary and began to have suspicions that something other than merit was holding Plaintiff back. Therefore, within 300 days of Mr. Matheussen's discrete action, Plaintiff could have filed a complaint with the EEOC but he did not. Discrete employment acts do not qualify for tolling under the FPA. Noel, 622 F.3d at 274.

Because failure-to-promote claims based on discrete employment acts do not qualify for revival under the FPA, Plaintiff's claim is time-barred to the extent it depends on his allegation of not being promoted. See Noel, 622 F.3d at 275; Schuler, 595 F.3d at 375; see also Morrow v. L&L Prods., Inc., --

- F. Supp. 2d ---, No. 11-15589, 2013 WL 2034556, at *11 (E.D.
Mich. May 14, 2013) (holding that FPA "does not exempt a
plaintiff from pursuing claims upon discrete acts other than pay,
such as an alleged failure to promote based on gender").

### ii. ADEA retaliation

Again, even if the Court were to accept that the claim is
timely, Defendant would be entitled to summary judgment. The
Court is persuaded by the reasoning of unpublished Third Circuit
decisions and other authority that the failure of an employer to
create a new position of grants administrator for Plaintiff -- a
job title that did not exist at the time -- cannot be the basis
of a retaliation claim. See Young v. Temple Univ. Hosp., 359 F.
App'x 304, 310 (3d Cir. 2009) (not for publication) (holding that
the failure to promote the plaintiff to a "position [that] did
not exist when [plaintiff] requested the promotion," cannot
constitute an adverse employment action or support a prima facie
case of retaliation); Vuong v. Mgmt. of J.C. Penney's Co., 169 F.
App'x 675, 677 (3d Cir. 2006) (faulting plaintiff for failing to
provide evidence that the positions she requested actually
existed or had openings at the times she applied, among other
things); Frintner v. TruePosition, 892 F. Supp. 2d 699, 710-11
(E.D. Pa. 2012) (granting summary judgment for the defendant
employer because the evidence showed not more than plaintiff's
supervisor proposed a promotion for plaintiff and drafted a job

30

description for the plaintiff, but the desired position "was never created" by the employer); Stoppi v. Wal-Mart Transp., LLC, No. 09-916, 2010 WL 3398990, at *9 (M.D. Pa. 2010) (rejecting the plaintiff's argument that she suffered an adverse action when her employer "decided not to create the position to avoid having to promote her," when no one was hired to fill a position that did not exist); Hottenroth v. Vill. of Slinger, 388 F.3d 1015, 1032 (7th Cir. 2004) (stating that "an adverse employment action does not include an employer's refusal to grant an employee an discretionary benefit to which she is not automatically entitled" and that plaintiff failed to establish "that she was ever entitled to have a new position created for her"); Exum v. U.S. Olympic Comm., 389 F.3d 1130, 1137 (10th Cir. 2004) (holding that a plaintiff failed to establish a prima facie case of discrimination because "[a]n employer's failure to promote a plaintiff to a non-existent position is not enough to support a presumption of intentional racial discrimination").

Plaintiff attempts to distinguish Young by stating that the plaintiff in that case presented no evidence that the defendant took affirmative steps to block the creation of the position. (Id.) Further, Plaintiff argues that in Frintner the plaintiff only pointed to her own testimony that her supervisor would "try to" get her a new title, but the record otherwise did not have evidence of the defendant's intentional conduct. (Id. at 26.)

Plaintiff concludes that "Defendant cannot shield itself from liability for retaliation when the failure to create this position <u>was</u> the retaliatory adverse action against Plaintiff." (<u>Id.</u>)

The Court sees no meaningful way to distinguish Plaintiff's situation from that in <u>Young</u>, <u>Frintner</u>, or the other similar cases cited by Defendant.[12] Both Plaintiff and the plaintiff in <u>Frintner</u> were told by supervisors that they deserved promotions, the supervisors proposed a promotion and drafted a job description. <u>See</u> <u>Frintner</u>, 892 F. Supp. 2d at 711. Despite the support of supervisors and an outside consultant, Plaintiff here simply was not entitled to a job that did not exist. <u>See</u> <u>Hottenroth</u>, 388 F.3d at 1033 (finding no adverse action when a supervisor did not request that the village board create a new position for the plaintiff, because the plaintiff was not entitled to a new position).

The Court finds unavailing Plaintiff's argument that the

---

[12] Plaintiff also argues that <u>Young</u> applied the wrong standard in defining "adverse action" because it did not cite <u>Burlington N. & Santa Fe Ry. Co. v. White</u>, 548 U.S. 53, 68 (2006). (Pl. Opp'n at 26 n.10.) This Court does not sit in judgment of the Third Circuit, and the Court disagrees that applying <u>Burlington N.</u> changes the outcome here. A reasonable jury could not conclude that a reasonable worker would be dissuaded from making a charge of discrimination if he knew that, at some point in the future, he might not be entitled to a promotion to a position that did not exist and had never existed, and which carried no higher salary than what the employee, supervisors and consultants believed he was entitled to receive in his current position.

affirmative acts of Defendant distinguish his case from the relevant precedents. All plaintiffs bringing retaliation suits allege that intentional, discriminatory animus or a retaliatory purpose actually animated the failure to promote or to create a job title. Plaintiff argues that he has affirmative evidence that Mr. Matheussen "pulled" the position from the agenda, but this fact is unremarkable when board action still would have been required to create the new job title, and there was no guarantee that the board would have passed the measure, even if it had stayed on the agenda. Although Shanahan wanted to create the position, had a successful record of advocating for new positions for others, and likewise strongly advocated for Plaintiff, he did not have the authority to create the post and thus could not "promise" the job to Plaintiff. Plaintiff effectively asked Defendant to take a step it never had taken before, creating a new position for him with higher compensation. A "subjective expectation that [an employer] would create an entirely new position for [him] (and [him] alone) cannot support a prima facie case of retaliation." Young, 359 F. App'x at 310; see also Stoppi, 2010 WL 3398990, at *9 (granting summary judgment for the employer when the plaintiff "hoped to be promoted," among other reasons). In the end, the DRPA was not obligated to create a new position for Plaintiff, and the ADEA does not compel DRPA to create a such a post. The failure to invent a new position for

Plaintiff in these circumstances was not an adverse action for purposes of a retaliation claim under the ADEA.

## C. Failure to give Plaintiff a raise

### i. Timeliness

Finally, Plaintiff claims that he was denied a raise despite that the fact that his supervisors and an outside consultant all recommended that Plaintiff's salary be increased to Grade 10, even without a change in job title. This claim is closer to that of the plaintiff in <u>Mikula</u>, who requested a raise and a new job title but never heard back. The Third Circuit permitted the plaintiff's claim to be tolled under the FPA in that case. <u>See</u> <u>Mikula</u>, 583 F.3d at 186-87 ("failure to answer a request for a raise qualifies as a compensation decision because the result is the same as if the request had been explicitly denied"). Here, there is no discrete moment where Plaintiff learned that a request for a raise was approved or rejected. Rather, the record shows a long process of discussions, requests and studies, but no solid commitment from high-level employees. Defendant took some action -- more action than the employer in <u>Mikula</u>, it appears -- but still never provided Plaintiff with an answer. A failure to answer the request is the same as a denial. <u>Id.</u>

Defendant says its actions of retaining a consultant and considering the Hay Group recommendation in 2010 distinguish this case from <u>Mikula</u>, where the employer simply never responded to

Plaintiff. In other words, Defendant asserts that it was responding to Plaintiff's request and was working toward implementation. But no evidence suggests that anything definitive about the raise had been decided -- or would be decided at any point in the future, for Plaintiff or other grants specialists -- and no word filtered back to Plaintiff. Just as a failure to answer resembles a denial, at a certain point, a slow process of implementation begins to look like a failure to respond. Essentially, for as long as Plaintiff requested a raise, he met with, if not silence, incremental steps toward a resolution or unending delay in implementing a potential raise -- effectively silence. Because Plaintiff alleges a retaliatory compensation decision in the denial of his request for a raise, he is entitled to the benefit of FPA tolling under Mikula.[13] Each new paycheck

---

[13] Defendant's other reasons to distinguish Mikula are unpersuasive. Defendant observes that in Mikula, the plaintiff herself requested a raise, and here only Plaintiff's supervisors requested a raise. Defendant does not explain the significance of such a distinction, and the Court cannot think of one. An employer may retaliate against an employee whether the employee himself or someone else lodges the request for a raise.

Second, the Plaintiff here did receive annual merit increases over this period, whereas the plaintiff in Mikula received no raises whatsoever. But this argument goes more to causation or pretext -- or damages -- than whether the claim presents a compensation decision for purposes of the FPA. The suggestion that the DRPA did not retaliate against Plaintiff as much as it could have (by granting merit increases) is not a reason to bar the claim under the FPA. Plaintiff argues that the merit increases did not match what Plaintiff would have earned if his salary had been bumped up two grades. Therefore, the denial of, or lack of resolution concerning, Plaintiff's request qualifies as a compensation decision independent of his merit

Plaintiff received constituted an independent "unlawful practice" under the ADEA, see 29 U.S.C. § 626(d)(3), and because Plaintiff did not retire until January 2010, his administrative complaint was timely in October 2009.

### ii. **ADEA retaliation claims, generally**

Because Plaintiff presents a timely claim for ADEA retaliation, the Court will turn to the merits. ADEA claims are governed by the burden-shifting framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). See Burton v. Teleflex, Inc., 707 F.3d 417, 425 (3d Cir. 2013); Fasold v. Justice, 409 F.3d 178, 188 (3d Cir. 2005).

First, the Plaintiff must establish a prima facie case of retaliation under the ADEA by showing that (1) he engaged in protected employee activity, (2) he was subject to adverse action by his employer, and (3) there is a causal connection between the protected activity and the adverse action. Fogleman, 283 F.3d at 568. An adverse action is "materially adverse" if it would "dissuade a reasonable worker from making or supporting a charge of discrimination." Pagan v. Holder, 741 F. Supp. 2d 687, 698 (D.N.J. 2010) (citing Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006)).

Upon Plaintiff's showing of a prima facie case, the burden shifts to Defendant to articulate "'a legitimate,

---

increases.

nondiscriminatory [justification] for the adverse employment action.'" Burton, 707 F.3d at 426 (quoting Smith v. City of Allentown, 589 F.3d 684, 690 (3d Cir. 2009)). Defendant's burden is minimal, as it is "one of production, not persuasion; it 'can involve no credibility assessment.'" Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142 (2000) (quoting St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 509 (1993)). Plaintiff must then "point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." Burton, 707 F.3d at 427 (quoting Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994)). Plaintiff "must demonstrate such weaknesses, implausibilities, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence,' and hence infer 'that the employer did not act for [the asserted] non-discriminatory reasons.'" Fuentes, 32 F.3d at 764 (emphasis in original, citations omitted). The "factfinder may infer from the combination of the prima facie case, and its own rejection of the employer's proffered reason, that the employer engaged in the adverse employment action for an invidious reason." Burton, 707 F.3d at 427.

### iii. Plaintiff's prima facie case

The parties agree, for purposes of this motion, that the first element -- protected activity -- has been satisfied.

The key inquiry for the Court is whether a reasonable jury could infer, based on the current record, that Plaintiff suffered a materially adverse employment action when Defendant did not raise his salary grade, despite giving him annual merit increases. To put it another way, the question is whether a reasonable jury conclude that a reasonable worker would be dissuaded from raising a charge of age discrimination if an employer would slowly deliberate, delay or deny a salary grade increase (worth approximately $11,000 per year), even if that employee received smaller annual merit increases in the meantime.

There is some support for the notion that a delay in implementing a pay raise is an adverse employment action. Pajic v. Cigna Corp., No. 89-2404, 1990 WL 191939, at *9 (E.D. Pa. Nov. 30, 1990) (stating that the defendant's "delay in reevaluating the salaries of . . . employees is evidence of discrimination" in discussing the "adverse employment action" prong of a prima facie retaliation claim); Johnson v. District of Columbia, --- F. Supp. 2d ---, No. 07-1033, 2013 WL 2420820, at *8 (D.D.C. June 5, 2013) (stating in dicta that a "claim that the District delayed and denied providing him with an allegedly promised pay raise arguably is an adverse employment action, if the claim is

properly supported by the record"); McNutt v. Nasca, No. 10-1301, 2013 WL 209469 (N.D.N.Y. Jan. 17, 2013) (denying summary judgment on the claim that a promised increase of the plaintiff's salary was withheld for about a year, in part because the defendant did not address the point in its motion); Ellins v. City of Sierra Madre, 710 F.3d 1049, 1061 (9th Cir. 2013) (concluding that a reasonable factfinder could conclude that the failure to sign the plaintiff's application deprived him of a raise from the date he was entitled to the raise to the date to which the employer chose to backdate her approval).

Other courts look to whether a raise was discretionary to determine whether failure to give a raise is actionable. See Davis v. Cleary, No. 09-925, 2011 WL 4435697, at *9 (D.N.J. Sept. 22, 2011) (stating that "'the denial of a raise can constitute a materially adverse employment action if a raise would have been an expected element of the employee's salary and its denial cuts the salary in real terms,'" but finding that the plaintiff "lacked any expectancy in a salary increase because . . . the board had already denied her request for such an increase") (quoting Griffin v. Potter, 356 F.3d 824, 830 (7th Cir. 2004)); But the Third Circuit recently held that a district court erred when it concluded that the plaintiff "did not suffer an adverse employment action merely because the [defendant] DEA possessed discretion on whether to extend the [employment] agreement" to

which the plaintiff claimed entitlement. Sala v. Hawk, 481 F. App'x 729, 732 (3d Cir. 2012). See also Walker v. Bd. of Regents of Univ. of Wis. Sys., 300 F. Supp. 2d 836, 852 (W.D. Wis. 2004) ("To the extent that defendants suggest that there is no adverse employment action when the employer's decision is a discretionary one, the court of appeals has squarely rejected this argument.") (citing Power v. Summers, 226 F.3d 815, 821 (7th Cir. 2000), which held a denial of a discretionary raise is an adverse employment action).

In this case, the denial of a raise, or delay in implementing a raise, is a materially adverse employment action for purposes of Plaintiff's prima facie case. The decision had a significant impact on Plaintiff's salary, even if he did receive modest annual merit increases. Moreover, this is not a case in which a plaintiff requested a raise on a whim or delusional prayer and was rebuffed by his employer. Here, though a raise would have been discretionary, the record shows that nearly all of the major players involved, including Plaintiff's supervisors and the vice chair of the board of commissioners, were in favor of a raise, an outside consultant recommended a raise, and at least one supervisor questioned whether some ulterior motive was at play in the denial of his raise. In these circumstances, the ultimate denial or indefinite delay of implementing the raise is an adverse action. See Sala, 481 F. App'x at 732 (holding that

the defendant's discretion does not preclude a finding of adverse action); Power, 226 F.3d at 821 (same).

Defendant relies on the fact that it did retain a consultant to study the request for a raise, and that an increase was "contemplated" to take effect in 2010. Ms. Brown testified:

> I believe that at some point, and I might be confusing the years, but I believe at some point this was going to become a part of the operating budget and the salary was going to be increased. The grade, the position was going to be increased from a Great 8 to a 10 at some point.

(Brown Dep. 162:11-19.) She added: "an increase certainly was contemplated for the grants specialist position, which would have taken effect on January 1, 2010." (Id. at 194:6-8.) There is nothing in the record to indicate that a raise, even in late 2009, was more than "contemplated." A delay of such kind is, as a practical matter, akin to a denial, and the negative effect of this course of action can be considered adverse to Plaintiff.

The final prima facie element Plaintiff must establish is causation. The Third Circuit has described three ways to establish causation: showing "(1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link," or, in the absence of that proof, (3) "the plaintiff must show that from the 'evidence gleaned from the record as a whole' the trier of fact should infer causation." Lauren W. ex rel. Jean W. v. DeFlaminis,

480 F.3d 259, 267 (3d Cir. 2007); see also Diaz v. Donahoe, No. 10-6510, 2013 WL 85262, at *10 (D.N.J. Jan. 4, 2013).[14]

Here, Plaintiff does not argue that the timing of the alleged retaliation is unusually suggestive of causation or that he suffered a pattern of antagonism coupled with timing to establish a causal link.[15] (Pl. Opp'n at 11-12.) Instead, Plaintiff urges that a trier of fact may infer causation "through a broad array of evidence" in the record. (Id. at 12.)

Plaintiff argues that "[d]irect statements from Defendant's

_____

[14] Recently, the U.S. Supreme Court held that "a plaintiff making a retaliation claim under 42 U.S.C. § 2000e-3(a)" -- which closely resembles the ADEA retaliation provision -- "must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer." Univ. of Texas Sw. Med. Ctr. v. Nassar, 133 S. Ct. 2517, 2534 (2013). The Supreme Court previously held that a plaintiff in an ADEA disparate treatment action must prove by a preponderance of the evidence that age was the but-for cause of the challenged employer decision. Gross v. FBL Fin. Servs., Inc., 557 U.S. 167, 177-78 (2009) (interpreting 29 U.S.C. § 636(a), not the ADEA retaliation provision). Combined, Gross and Nassar point to the same result in an ADEA retaliation claim: the plaintiff's protected activity must have a determinative effect on the defendant's retaliatory activity. See also Model Jury Instructions for the U.S. Court of Appeals for the Third Circuit § 8.1.5 (2012), available at http://www.ca3.uscourts.gov/sites/ca3/files/8_Chap_8_2012_July.pdf (last visited Nov. 4, 2013) (discussing Gross but not Nassar).

[15] The Court agrees that the timing of alleged retaliation is not unusually suggestive of causation, but, on the other hand, the temporal period is not so great to render causation far-fetched. Here, the resistance to granting Plaintiff's pay raise seems to have started soon after the controversy about reimbursement in 2004 into 2005. After that, Plaintiff's supervisors continued to reference his reimbursement or his employment history in discussing issues related to Plaintiff's compensation.

upper management employees . . . show that Defendant <u>refused</u> to take any action to support Plaintiff in retaliation for his complaints of age discrimination and in an effort to use the money saved to offset its own costs in reimbursing Plaintiff's tuition. (<u>Id.</u>) Those statements include: (1) Ms. Brown's comment that "this one is a real stretch, especially in light of everything that has already been done" (<u>id.</u> at 13; Pl. Ex. L.); (2) Ms. D'Alessandro's testimony that Mr. Joyce did not support a raise because "there's a history here" and Defendant had made accommodations for Plaintiff in the past ("bent over backwards") and was not going to make another (Pl. Opp'n at 17; D'Alessandro Dep. at 21:17-22:11, 27:5-18); and (3) Mr. Matheussen's comment that "I'm concerned about a whole host of issues, none the least of which are Jim's settlement/raise last year (could you tell me $ amounts and dates on that) . . . ." (Pl. Opp'n at 19, Pl. Ex. M.) Ms. Hayes also suggested in an email that she suspected some "underlying reason for the lack of action on this . . . ." (Pl. Opp'n at 22; Pl. Ex. K.) Plaintiff suggests that "[c]ausation is clear in this case as CEO Matheussen himself ties the decision to stall Plaintiff's advancement in the company with the 'settlement' he achieved after complaining . . . ." (Pl. Opp'n at 20.)

Defendant contends that Plaintiff must tie the alleged protected activity to an adverse action, not the resulting

tuition reimbursement. (Reply at 4.) Defendant argues that Plaintiff presents no evidence that his comment to Ms. Brown caused any retaliation. (Id.)

It would be improper for the Court to enter summary judgment at the present time on this claim. There is enough material in the record, viewed in the light most favorable to the Plaintiff, for a jury to infer that retaliation caused the adverse employment action. A jury could choose to read between the lines of the correspondence and testimony in the record to conclude that Mr. Matheussen and others were angry or fed up with Plaintiff's challenge of his tuition reimbursement and retaliated against him for raising the specter of age discrimination in the process. A reasonable jury could find that the evidence suggests a link between the denial and the payout that resulted from Plaintiff's appeal, and a jury would be entitled to believe that Plaintiff's allegation of age discrimination was instrumental to his appeal and thus caused the denial of his future raise requests. At least one of Plaintiff's supervisors believed some ulterior motive was responsible for Defendant's inaction. A jury might infer the same. Plaintiff has established a prima facie case of age discrimination.

### iii. Legitimate reason and pretext

Under <u>McDonnell Douglas</u>, Defendant must put forth some legitimate, non-discriminatory reason why Plaintiff's pay grade

44

was not adjusted. Defendant asserts that Mr. Matheussen's July 25 e-mail suggests legitimate, non-discriminatory reasons for why Plaintiff's pay grade should not have been adjusted, including the facts that Plaintiff was awarded the job without posting the position for other applicants, that Defendant had budget problems, and that the decision could have an impact on Defendant's purchasing. (Reply at 11; Pl. Ex. M.) Plaintiff argues that any proffered reason is pretext, based largely on the same evidence Plaintiff uses to assert causation.

The question for the Court is whether the Plaintiff points to some evidence from which a factfinder rationally could find the proffered reason unworthy of credence. Fuentes, 32 F.3d at 764; Burton, 707 F.3d at 427. Here, a factfinder could disbelieve Defendant's stated reasons, based on the same evidence Plaintiff cites to make his prima facie case. The statements from Mr. Matheussen and others, noting the settlement as one factor for the denial, as well as the overwhelming support by the supervisors and other authority figures within the DRPA could lead a factfinder to believe that Plaintiff's invocation of age discrimination in connection with his request for reimbursement really was a determinative factor in Plaintiff's subsequent treatment. Accordingly, summary judgment is denied in part.

### D. Liquidated damages

Finally, Defendant argues that Plaintiff is not entitled to

liquidated damages, which are only available if the employer willfully violates the law. (Def. Mot. Br. at 29); 29 U.S.C. § 626(b) (providing for double the amount of damages for lost wages and benefits if the employer willfully violates the law); Trans World Airlines, Inc. v. Thurston, 469 U.S. 111, 125 (1985)). Defendant argues that Plaintiff admitted the DRPA did not act with malice, that Defendant was helpful in getting tuition reimbursement, that Mr. Shanahan never discriminated or retaliated against him, and that Plaintiff has "no facts" to suggest that Mr. Matheussen acted improperly with respect to the grants administration position. (Def. Mot. Br. at 29-30.)

Plaintiff retorts that Defendant "willfully denied Plaintiff compensation," illustrated by comments tying the compensation decisions to the receipt of tuition reimbursements and stating that Defendant had accommodated Plaintiff in the past and were not going to bend over backwards for him again. (Pl. Opp'n at 27.)

A jury should decide whether the evidence suggests Defendant's actions were willful, which could be inferred from the record. Therefore, the motion for summary judgment is denied as to liquidated damages.

## V. Conclusion

Defendant's motion for summary judgment is granted in part and denied in part. To the extent Plaintiff brings a claim

alleging a violation of the ADEA retaliation provision for (1) failure to set Plaintiff's salary at grade 10 when he was promoted to grants specialist and (2) failure to promote Plaintiff to the position of grants administrator, summary judgment is granted. To the extent Plaintiff brings an ADEA retaliation claim on the grounds of being denied a raise, summary judgment is denied. As material facts going to willfulness are in dispute, Plaintiff is entitled to have a jury decide the liquidated damages question, so summary judgment is denied as to liquidated damages. An accompanying Order will be entered.


**November 6, 2013**                    **s/ Jerome B. Simandle**
Date                                    JEROME B. SIMANDLE
                                        Chief U.S. District Judge